UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Connie Jean Rye,

      Plaintiff,

      v.                                 Civil Action No. 2:14-cv-170

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

      Defendant.

**OPINION AND ORDER**
(Docs. 10, 17)

Plaintiff Connie Jean Rye brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security denying her applications for Disability Insurance Benefits (DIB) and

Supplemental Security Income (SSI).  Pending before the Court are Rye's motion to

reverse the Commissioner's decision (Doc. 10), and the Commissioner's motion to affirm

the same (Doc. 17).  For the reasons stated below, Rye's motion is DENIED, and the

Commissioner's motion is GRANTED.

**Background**

Rye was 40 years old on her alleged disability onset date of August 1, 2006.

(AR 323.)  She stopped attending school in the eighth grade and does not have a GED.

(AR 56, 71, 292.)  She has worked as a cashier, a kitchen aide, and a nursing assistant.

(AR 60, 95, 300.)  She is not married and has an adult daughter.  (AR 57.)  During the

alleged disability period, she was living in a mobile home with her boyfriend.  (AR 57, 68, 72, 290, 314, 322.)  Rye has never known her father, and her mother died when she was 14 years old.  (AR 70, 404, 406, 640.)  She was raped on two separate instances when she was in her early teens, resulting in the birth of her daughter when Rye was only 14 years old.  (AR 15, 70–71, 391, 394, 402, 404, 640.)  Since then, Rye has married twice, both marriages ending due to her husbands' physical and/or mental abuse. (AR 72, 640.)

Since she was a teenager, Rye has complained of back pain.  (AR 517, 700, 763, 800, 899, 902–03.)  Beginning in November 2001, she received lumbar facet joint steroid injections, which worked well.  (AR 719, 721, 777–78, 781, 783, 785, 788.)  She also took various prescription narcotics and other medications, including Percocet and methadone, for pain.  (AR 64, 468, 470, 714, 722, 787–89.)  Despite these attempts to alleviate her back pain, Rye testified at the November 2013 administrative hearing that her most significant medical issue was still her lower back pain (AR 63), which she stated had been at a pain level of about 7–9 out of 10 for "[o]ver 10 years" (AR 65).

Rye also has a history of migraine headaches.  (AR 708, 902, 910, 937.)  In approximately 1984, she was diagnosed with asthma (AR 938; *see* AR 432, 483–517, 650, 756, 762–63); and in 1999, she was assessed with "[a]sthma with possible component of [chronic obstructive pulmonary disease (COPD)]" (AR 763), which later became a diagnosis of COPD (AR 478, 492, 570, 599, 601, 609, 647, 685–88).  Despite her breathing problems, Rye has smoked cigarettes since at least 1984, smoking a pack a day in January 2010, two packs a day in approximately November 2011, and a pack a day

in November 2013.  (AR 59–60, 517, 757, 902.)  In addition to her back pain, headaches, asthma, and COPD, Rye also suffers from depression, posttraumatic stress disorder (PTSD), insomnia, and limited cognitive ability.  (*See, e.g.*, AR 433, 487, 511, 521, 604–06, 609–11, 640–41, 662.)

In November 2011, Rye protectively filed applications for social security income and disability insurance benefits.  In her disability application, Rye alleged that, starting in August 2006, she stopped working due to COPD, lower back pain, migraines, asthma, and kidney problems.  (AR 291.)  Her application was denied initially and upon reconsideration, and she timely requested an administrative hearing.  The hearing was conducted on November 5, 2013 by Administrative Law Judge (ALJ) Paul Martin. (AR 49–126.)  Rye appeared and testified, and was represented by an attorney.  A vocational expert (VE) also testified at the hearing.  On November 22, 2013, the ALJ issued a decision finding that Rye was not disabled under the Social Security Act from her alleged onset date of August 1, 2006 through the date of the decision.  (AR 29–42.) Thereafter, the Appeals Council denied Rye's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 6–9.)  Having exhausted her administrative remedies, Rye filed the Complaint in this action on August 11, 2014. (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

4

Employing this sequential analysis, ALJ Martin first determined that Rye had not engaged in substantial gainful activity since her alleged disability onset date of August 1, 2006.  (AR 31.)  At step two, the ALJ found that Rye had the following severe impairments: COPD, migraine headaches, low back pain of unknown etiology, and depression.  (AR 32.)  At step three, specifically considering Listing 3.02 (for chronic pulmonary insufficiency), Listing 11.03 (for non-convulsive epilepsy), Listing 1.04 (for disorders of the spine), Listing 12.04 (for affective disorders), and Listing 12.06 (for anxiety disorders); the ALJ found that none of Rye's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 32–34.)  Next, the ALJ determined that Rye had the RFC to perform "light work," as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except as follows:

> [Rye] can sit, stand, and walk for one hour each at a time followed by a change of position or the ability to stretch before resuming the activity.  She could do no climbing of ladders, ropes, or scaffolds, but has no other specific limitations in postural activities.  She should avoid even moderate exposure to fumes, dusts, gases, and other respiratory irritants, as well as exposure to dangerous machinery and unprotected heights.   [She] is restricted to unskilled and semi-skilled work.  She should avoid fast-paced production requirements and more than simple work-related decisions and routine workplace changes.   She can interact with coworkers and supervisors on a routine basis.   She can interact with the public on an occasional, superficial level.  She can maintain concentration, persistence, and pace for up to two-hour blocks of time.

(AR 34.)  Given this RFC, the ALJ found that Rye was unable to perform her past relevant work as a cashier II, a cashier/checker, a kitchen aide, and a nursing assistant.  (AR 40.)  Finally, based on testimony from the VE, the ALJ determined that Rye could perform other jobs existing in significant numbers in the national economy, including the

following representative occupations: marker, power screwdriver operator, and cafeteria worker.  (AR 41.)  The ALJ concluded that Rye had not been under a disability, as defined in the Social Security Act, from the alleged onset date of August 1, 2006 through the date of the decision.  (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.*

*Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126

(2d Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the factfinder.").  "Substantial evidence" is more than

a mere scintilla; it means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the

Social Security Act is "a remedial statute to be broadly construed and liberally applied."

*Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Rye claims that the ALJ made numerous critical errors in his decision, including:

at step two, in his assessment of the severity of Rye's impairments; at step three, in his

determination that Rye did not have an impairment or combination of impairments that

met or medically equaled a listed impairment; in his assessment of Rye's RFC; in his

analysis of the medical opinions; in his assessment of Rye's credibility; and at step five,

in his finding that jobs existed in significant numbers in the national economy that Rye

could perform.  Additionally, Rye contends that the ALJ should have reopened her prior

June 2008 disability applications, and that the Appeals Council erred in refusing to

consider two exhibits introduced as additional evidence after the ALJ issued his decision.

The Commissioner opposes each of Rye's claims.

For the reasons discussed below, the Court finds in favor of the Commissioner and

affirms the decisions of the ALJ and the Appeals Council.

## I.     Step-Two Severity Assessment

Rye first argues that the ALJ erred in his step-two assessment of the severity of her impairments.  It is the claimant's burden to show at step two that she has a "severe impairment," meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); *see Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("If the process ends at step two, the burden of proof never shifts to the [Commissioner]. . . .  It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.").  An impairment or combination of impairments is "not severe" when medical evidence establishes "only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on [the claimant's] ability to work."  SSR 85-28, 1985 WL 56856, at *3 (1985).  Importantly, the omission of an impairment at step two does not in and of itself require remand and may be deemed harmless error.  *See Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (applying harmless error standard in social security context, and holding that, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration").  This is particularly true where the disability analysis continued and the ALJ considered all of the claimant's impairments in

combination in his RFC determination.  *See Reices-Colon v. Astrue*, 523 F. App'x 796,

798 (2d Cir. 2013) (finding alleged step-two error harmless because ALJ considered

impairments during subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233, n.1 (2d

Cir. 2010) (same); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (any ALJ error in

failing to list plaintiff's bursitis at step two was harmless, because the ALJ "extensively

discussed" the bursitis and "considered any limitations posed by [it] at [s]tep 4").

   As noted above, the ALJ found that Rye had the severe impairments of COPD,

migraine headaches, low back pain, and depression.  (AR 32.)  Rye asserts that the ALJ

should have also considered, at step two, whether Rye's following additional

impairments were severe: asthma, personality disorder, insomnia, PTSD, limited

cognitive ability, and degenerative disc disease.  (Doc. 10 at 6.)  Rye does not specify

why each of these impairments meets the regulatory definition of a "severe" impairment.

In any event, the Court finds that any error the ALJ may have made at step two was

harmless, given that the ALJ continued with the sequential analysis, considering all of

Rye's alleged impairments in combination and accounting for them in his RFC

determination.  (*See* AR 32–40.)

   For example, the ALJ considered Rye's asthma in conjunction with his

consideration of her COPD and general "breathing difficulties," noting spirometry results

and other medical evidence.  (AR 38 (citing AR 570).)  The ALJ also noted that Rye

continued to smoke, despite her doctor encouraging her to stop.  (*Id.*; *see* AR 476–78,

757, 760–62, 769.)  The ALJ reasonably concluded that Rye's ability to take short walks

and clean her house suggested her respiratory ailments did not prevent her from working.

(AR 38; *see* AR 68, 315–16, 319, 339, 581.)  Regarding Rye's personality disorder, insomnia, PTSD, and limited cognitive ability, the ALJ discussed the findings of psychologists M. Corbin Gould, MA and Diana Greywolf, PhD related to these impairments, but noted that: (a) Gould opined that Rye's mental health problems "do not significantly interfere with her daily activities," and (b) Dr. Greywolf's records "do[] not document any mental status examination or other observations of [Rye's] functioning," as discussed in more detail below.  (AR 39; *see* AR 604–06, 622–34, 641.)  With respect to Rye's degenerative disc disease, the ALJ thoroughly considered Rye's allegations that she was impaired by back pain and in fact found that Rye's "low back pain of unknown etiology" was a severe impairment.  (AR 32.)  The ALJ explicitly considered whether this impairment met the criteria for Listing 1.04, which encompasses disorders of the spine including degenerative disc disease.  (*Id.*)  The ALJ further considered an MRI of Rye's lumbar spine and examination findings relating to Rye's strength, range of motion, motor function, posture, gait, and other tests relevant to her back impairment.  (*See* AR 32–40.)

Furthermore, the ALJ accounted for Rye's various limitations and impairments, severe or not, in his RFC determination.  Specifically, accounting for her breathing impairments, the ALJ found that Rye should "avoid even moderate exposure to fumes, dusts, gases, and other respiratory irritants."  (AR 34.)  Accounting for Rye's back impairment, the ALJ found that Rye could sit, stand, and walk for only one hour each at a time, followed by a change of position or the ability to stretch before resuming the activity; could never climb ladders, ropes, or scaffolds; and should avoid exposure to dangerous machinery and unprotected heights.  (*Id.*)  Accounting for Rye's mental

impairments, including cognitive limitations, the ALJ found that Rye was restricted to "unskilled and semi-skilled work"; should avoid "fast-paced production requirements and more than simple work-related decisions and routine workplace changes"; could interact with coworkers and supervisors only "on a routine basis"; could interact with the public only "on an occasional, superficial level"; and could maintain concentration, persistence, and pace for only "up to two-hour blocks of time." (*Id.*)

Accordingly, Rye's step-two severity argument fails, as any error the ALJ may have made at step two was harmless, given that he adequately considered the combined effects of Rye's physical and mental impairments throughout his decision, and accounted for these impairments in his RFC determination.

## II.     Step-Three Finding that Rye Did Not Have an Impairment or Combination of Impairments that Met or Medically Equaled a Listed Impairment

Rye next argues that the ALJ erred in finding that she did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  Rye claims that the ALJ should have considered whether her personality disorder met the criteria for Listing 12.08, rather than considering only Listing 12.04, applicable to affective disorders, and Listing 12.06, applicable to anxiety disorders.  Rye further claims that, in determining whether her personality disorder met or medically equaled a listing, the ALJ should have considered "significant longitudinal evidence showing [Rye's] impaired mental functioning," and should have given more weight to Dr. Greywolf's opinions.  (Doc. 10–1 at 8.)  The Court finds no error.

11

The Listings are regulatory descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. *Sullivan v. Zebley*, 493 U.S. 521, 529–30 (1990) (citing 20 C.F.R. pt. 404, subpt. P, app. 1 (pt. A) (1989)).  Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results.  *Id.* at 530.  For a claimant to show that his or her impairment matches a listing, the impairment must meet "*all* of the specified medical criteria" of that listing.  *Id.*  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id.*  Likewise, for a claimant to qualify for benefits by showing that his or her unlisted impairment, or combination of impairments, is "equivalent" to a listed impairment, he or she must present medical findings equal in severity to "*all* the criteria for the one most similar listed impairment."  *Id.* at 531.  The Social Security Administration has explained that a determination that a claimant's impairment or combination of impairments is medically the equivalent of a listed impairment "must be based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques, including consideration of a medical judgment about medical equivalence furnished by one or more physicians designated by the Secretary."  SSR 86-8, 1986 WL 68636, at *4 (1986), *superseded on other grounds by* SSR 91-7c, 1991 WL 231791 (1991).

For a claimant to meet or equal the severity of Listing 12.08, she must suffer from a personality disorder, meaning "inflexible and maladaptive" personality traits that "cause either significant impairment in social or occupational functioning or subjective distress."  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.08.  Moreover, the claimant must

satisfy the criteria of *both* paragraphs A and B of the Listing.  *Id.*  Paragraph A requires

"[d]eeply ingrained, maladaptive patterns of behavior associated with one of the

following: 1. Seclusiveness or autistic thinking; or 2. Pathologically inappropriate

suspiciousness or hostility; or 3. Oddities of thought, perception, speech and behavior;

or 4. Persistent disturbances of mood or affect; or 5. Pathological dependence, passivity,

or aggressivity; or 6. Intense and unstable interpersonal relationships and impulsive and

damaging behavior."  *Id.* at § 12.08(A).  Paragraph B requires that the behaviors

established in paragraph A "[r]esult[ ] in at least two of the following: 1. Marked

restriction of activities of daily living; or 2. Marked difficulties in maintaining social

functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace;

or 4. Repeated episodes of decompensation, each of extended duration."  *Id.* at §

12.08(B).

The criteria for paragraph B of Listing 12.08 for personality disorders are the same

as those for paragraph B of Listing 12.04 for affective disorders, *compare id. with id.*

at § 12.04(B); and the ALJ explicitly considered whether these criteria were met in this

case.  The ALJ found that Rye had "mild restriction" in activities of daily living;

"moderate difficulties" in social functioning; "moderate difficulties" in concentration,

persistence, or pace; and "no episodes of decompensation."  (AR 32–33.)  The ALJ

explained these findings in detail, properly stating that, despite Dr. Greywolf's opinion to

the contrary, "treatment notes show that [Rye] reported limitation in daily activities only

due to her physical condition" and not as a result of her mental health symptoms.

(AR 32.)  The ALJ also pointed out that Rye's Function Reports indicate that, though

limited by physical pain, Rye was able to dress herself, make coffee, do housework, attend appointments, and shop in stores.  (AR 32–33; *see* AR 314–17, 338–41.)  The ALJ further noted that Rye's Function Reports indicate that she was able to spend time with others, go out into the public regularly and on her own, get along with others, watch a television show from start to finish, and follow instructions adequately.  (AR 33; *see* AR 318–20, 342–44.)  Finally, the ALJ accurately stated that, aside from Dr. Greywolf's opinion, "[t]he record does not document any acute episodes of mental health functioning requiring intensive treatment or representative of a decreased level of functioning."[1] (AR 33.)  In fact, the record taken as a whole, including objective treatment records from medical providers (discussed in more detail below), indicates that Rye's mental health impairment did not significantly limit her functioning during the relevant period: she was generally cooperative and alert at medical appointments and had minimal psychiatric complaints other than insomnia and occasional anxiety due to external stresses like her husband drinking at home.  (*See, e.g.*, AR 314–20, 338–44, 448, 451, 455, 461, 464, 641, 791, 794, 799, 884, 886, 889, 891.)  Although Rye experienced periods of depression during the relevant period (*see, e.g.*, AR 609, 611, 641, 653–55, 661–65), the record as a

---

[1]  Rye argues that, because Dr. Greywolf opined that Rye experienced episodes of decompensation, and because the record includes evidence that Rye was raped as an adolescent, attempted suicide, and was diagnosed with clinical depression; the ALJ should have "further develop[ed] the record" to determine whether Rye experienced episodes of decompensation.  (*See* Doc. 10-1 at 13–14.)  But the record, including over 500 pages of medical notes (AR 432–939), is extensive and contains no obvious gaps.  The ALJ was thus not obligated to make attempts to obtain more records.  *See Rosa v. Callahan*, 168 F.3d 72, 79, n.5 (2d Cir. 1999) ("where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim") (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)).

whole indicates relatively stable moods and a normal, bright affect (*see, e.g.*, AR 523, 526, 546, 576, 579, 581, 585, 650, 791, 794, 799, 884, 886, 889, 891, 893–94).

Because the ALJ assessed the paragraph B criteria for Listing 12.04, and that criteria is the same for Listing 12.08, and because the ALJ's assessment of that criteria is supported by substantial evidence, the ALJ did not err in failing to explicitly consider Listing 12.08 at step three. *See Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982) (per curiam) ("the absence of an express rationale does not prevent us from upholding the ALJ's determination regarding appellant's claimed listed impairments, since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence"). This is especially true given the ALJ's acknowledgement later in his decision that Dr. Greywolf opined that Rye met the criteria of Listing 12.08. (*See* AR 39, 622.) That opinion, however, constitutes the only meaningful evidence supporting Rye's listings argument. And, as explained in detail below, the ALJ properly afforded little weight to Dr. Greywolf's opinions because they are not well supported and are inconsistent with the evidence of record. (*See* AR 39–40.)

Rye's claim that the ALJ ignored "significant longitudinal evidence showing impaired mental functioning" (Doc. 10-1 at 8), is also unpersuasive. Preliminarily, the ALJ is not required to discuss every event or piece of evidence that may be relevant to Rye's mental impairments. *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive

or insufficient to lead him to a conclusion of disability.")  Moreover, most of the "longitudinal evidence" that Rye relies on–including evidence documenting Rye's reporting of two instances of rape when she was a teenager, the death of her mother when she was 14 years old, her pregnancy and delivery of a baby when she was14 years old, and her reporting that she "slic[ed] her wrists" when she was in her 20s (*see* Doc. 10-1 at 8) (citing AR 70–71, 391, 394, 402, 487, 640)–occurred between the late 1970s and early 1990s, well before the alleged disability period began in 2006.  "While evidence of [a claimant's] condition prior to the [alleged disability] onset date . . . is to be considered by the ALJ in furtherance of evaluating whether the [claimant] qualifies for benefits, *the period between onset of disability and expiration of insured status is the focus of the inquiry*," *Ward v. Shalala*, 898 F. Supp. 261, 263 (D. Del. 1995) (emphasis added), and it is incumbent on the claimant to produce evidence of disability *during the alleged disability period*, *see* 20 C.F.R. §§ 404.131, 404.315(a); *Burkhart v. Bowen*, 856 F.2d 1335, 1340 n.1 (9th Cir. 1988) (ALJ correctly rejected medical evidence predating relevant time period); *Slaughter v. Astrue*, 857 F. Supp. 2d 631, 643 (S.D. Tex. 2012) (ALJ properly disregarded evidence outside relevant period of disability).

For these reasons, the ALJ properly found that Rye did not have an impairment or combination of impairments meeting or medically equaling a listed impairment.

## III.   Analysis of the Medical Opinions

Next, Rye claims the ALJ erred in his analysis of the medical opinions, which contributed to an inaccurate assessment of Rye's RFC.

### A.    Dr. Greywolf

Rye argues that the ALJ should have given controlling weight to the opinions of psychologist Diana Greywolf, PhD, and failed to give good reasons for affording little weight to these opinions.  Rye also argues that the ALJ failed to properly assess the regulatory factors in determining how much weight to afford to Dr. Greywolf's opinions. The Court finds that the ALJ did not err in his analysis of Dr. Greywolf's opinions.

In approximately the fall of 2013, Rye's attorney referred her to Dr. Greywolf "for diagnostic clarification" (AR 604) and "evaluation of current functioning" (AR 21).  (*See* AR 25.)  On October 24, 2013, Dr. Greywolf submitted a letter to Rye's attorney which summarized the results of intelligence and psychological testing conducted by the Doctor in September and October 2013.  (AR 604–06.)  Dr. Greywolf stated that Rye's scores were average for reading comprehension; low average for cognitive ability, word reading, and overall written language skills; and extremely low for overall mathematics skills. (AR 604–05.)  Dr. Greywolf stated that Rye endorsed symptoms meeting five of the six criteria for PTSD, "suggesting that further assessment for PTSD might be warranted." (AR 605.)  Rye's score on a self-report instrument designed to screen for anxiety fell in the moderate range, "suggesting that her level of anxiety may at times interfere with her ability to process information, make decisions, and cope with environmental stressors." (AR 606.)  Her score on a self-report instrument designed to screen for depression fell in the severe range, suggesting that she "is experiencing a clinically significant level of depression" and "should be monitored for suicide risk."  (*Id.*)  A personality test

suggested that Rye "has difficulty understanding socially acceptable interpersonal conduct, which likely makes interpersonal relationships extremely challenging for her" and "would make a work environment very difficult to manage." (*Id.*) Dr. Greywolf opined that Rye's "deficiency [in] coping strategies could lead to difficulty regulating behavior in social or work settings." (*Id.*) Dr. Greywolf also found that Rye's test scores demonstrated "a clinically significant level of depression . . . as well as a high level of anxiety." (*Id.*) Dr. Greywolf concluded that Rye's testing supported diagnoses of major depressive disorder, PTSD, and depressive personality disorder; and that this combination of diagnoses "is likely to have a negative impact on [Rye's] ability to manage interactions with others, to communicate effectively, and to regulate her emotions, particularly in situations where there may be a misunderstanding of the intentions of others." (*Id.*)

On October 25, 2013 (a day after submitting the above-described letter to Rye's attorney), Dr. Greywolf completed a Psychiatric Review Technique form regarding Rye. (AR 622–34.) Therein, Dr. Greywolf opined that Rye met the criteria for Listing 12.08, the listing for personality disorders, stating: "this diagnosis is ongoing and likely to persist with stability over time." (AR 622.) Dr. Greywolf further opined that Rye had a "marked" restriction in activities of daily living; "extreme" difficulties in maintaining social functioning; "extreme" difficulties in maintaining concentration, persistence, or pace; and four or more episodes of decompensation, each of extended duration. (AR 632.) About a month later, on November 27, 2013, Dr. Greywolf submitted an "Interpretive Report" which again summarizes Rye's September and October 2013 testing. (AR 19–25.) The report also states that Rye's test results "suggest that she is

18

experiencing a high degree of depressive symptomatology" and that she requires a "close[] monitor" of her mood "as treatment moves forward."  (AR 25.)

About six months later, on May 30, 2014, Dr. Greywolf sent a letter to Rye's attorney, stating that her review of Rye's medical records, "which were not available at the time [she] wrote [her] original report," supported her November 2013 report. (AR 15.)  Dr. Greywolf noted that Rye found it "very upsetting to talk about her medical history" (*id.*), and demonstrated constricted affect, depressed mood, and a high level of anxiety at their interview (AR 16).  Dr. Greywolf opined that Rye's "historical medical records lend support to long-standing clinical depression, which has been present since at least the age of 13, but not fully evaluated until 2012," as well as PTSD, also not fully assessed until 2013, "although it is likely that it began as early as the age of 13 or 14 after [her] sexual assault."  (AR 15.)

The ALJ gave "little weight" to Dr. Greywolf's opinions "due to a lack of support by and consistency with the evidence of record."  (AR 40; *see also* AR 32–33, 35, 38–39.)  Rye's claim that the ALJ erred in his analysis of these opinions fails for two principal reasons.  First, the Court is reluctant to accept the opinions of Dr. Greywolf as those of a "treating source," as defined in the applicable regulations.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The record indicates that Dr. Greywolf examined Rye on only two occasions during a brief one-month period in the fall of 2013: first on September 4, 2013 and then on October 2, 2013.  (AR 21, 74, 84.)  Given such a limited treatment relationship over such a short period, it cannot be said that Dr. Greywolf was a "treating source" for purposes of the so-called "treating physician rule" under the

19

regulations.  *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source."); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (treating sources who see a patient only once or twice do not have a chance to develop an ongoing relationship with the patient and thus are generally not considered treating physicians); *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988) (defining a "treating physician" as a physician "who has or had an ongoing treatment and physician-patient relationship with the individual").  In *Mongeur*, 722 F.2d at 1039 n.2, the Second Circuit held that a physician's opinion is entitled to less weight when the physician did not treat the claimant on an ongoing basis.  The court emphasized that the opinion of a treating physician is given extra weight because of his unique position resulting from the "continuity of treatment he provides and the doctor/patient relationship he develops."  *Id.*  By contrast, a physician who examined a claimant only "once or twice" did not see the claimant regularly and thus did not develop a physician/patient relationship with him.  *Id.*  The Second Circuit concluded that such a physician's opinion was "not entitled to the extra weight of that of a 'treating physician.'"  *Id.*; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (an ALJ should generally "give more weight to" the opinion of a doctor who treated a claimant on an ongoing basis and thus could provide a "detailed, longitudinal picture of [the claimant's] medical impairment(s),"

20

offering a more "unique perspective to the medical evidence" than provided by reports from "individual examinations, such as consultative examinations or brief hospitalizations").  Given that Dr. Greywolf examined Rye on only two occasions over a one-month period, the ALJ did not err in giving less than controlling weight to Dr. Greywolf's opinions.

The second reason why Rye's claim that the ALJ erred in his analysis of Dr. Greywolf's opinions fails is because substantial evidence supports the ALJ's determination that these opinions are unsupported and inconsistent with the medical evidence of record, including Dr. Greywolf's own treatment records; and these were proper reasons to discredit the opinions.  The regulations provide that a treating physician's opinions must be given "controlling weight" when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  Where an ALJ gives a treating physician's opinions something less than "controlling weight," he must provide "good reasons" for doing so.  *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (per curiam).  Clearly, "s[]upportability" and "[c]onsistency" are factors in deciding the weight accorded to a medical opinion, and it is proper for an ALJ to give less weight to an opinion that is not supported and inconsistent with the rest of the record. 20 C.F.R. §§ 404.1527(c)(3)–(4), 416.927(c)(3)–(4).  Thus, the ALJ's rationale that Dr. Greywolf's opinions are entitled to less weight because they are unsupported and

inconsistent with the record, constitutes a "good reason," if supported by substantial evidence.[2]

After reviewing the record, including Dr. Greywolf's treatment notes, the Court finds that substantial evidence supports the ALJ's determination that Dr. Greywolf's opinions are "not only not supported by her own treatment notes, but also [not supported] by the remainder of the record, which does not document significant deficits upon mental status examination." (AR 39–40.) Specifically, as noted by the ALJ, Rye did not consistently report symptoms of depression, despite her frequent visits with medical providers, even denying having depression at times; and clinical examinations with medical providers do not document significant deficits in mental functioning. (*See, e.g.*, AR 38, 520 ("no depression"), 523 ("affect is relatively bright"), 535 ("no depression"), 543 ("denies depression"), 546 ("affect is bright"), 576 ("[a]ffect is normal"), 579 ("[n]o active anxiety or depression," "[a]ffect is normal"), 791 ("*Not Present-* Anxiety, Depression"), 794 (same), 798 (same), 799 ("[a]lert" mental status) ("normal" affect, speech, thought content/perception, and cognitive function), 884 (normal affect and cognitive function, "[a]ble to function and perform [activities of daily living]"), 886 (same), 890 (same), 893 ("*Not Present-* Anxiety, Depression").)

As discussed earlier, the record taken as a whole, including objective treatment records from medical providers, indicates that Rye's mental health impairment did not

---

[2] Contrary to Rye's assertion (*see* Doc. 10-1 at 14–15), the ALJ was not required to consider every regulatory factor in analyzing Dr. Greywolf's opinions. The Second Circuit does not require "slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation[s] are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (citing *Halloran*, 362 F.3d at 31–32).

significantly or consistently limit her functioning during the alleged disability period.

There are records indicating that Rye experienced anxiety and depression periodically,

like for example a February 2009 treatment note and a March 2009 treatment note stating

in parentheticals, respectively, that Rye was experiencing anxiety due to "*problems at*

*home with her husband drinking*" (AR 891; *see* AR 889); and a July 2013 treatment note

stating that she was continuing to see psychologist Gould for counseling regarding her

depression (AR 647).  (*See also* AR 595 (treatment note stating Rye was experiencing "a

significant amount of stress recently, particularly financial in nature"), 883 (treatment

note indicating Rye was "[h]aving some stress at home due to family issues pertaining to

a possible move to Vermont").)  But generally, the medical notes indicate that Rye was

cooperative and alert at medical appointments, and was not depressed or anxious.  Even

the February and March 2009 notes mentioned above state that, despite having problems

at home with her husband, depression was "Not Present."  (AR 889, 891.)  And the July

2013 note mentioned above states that Rye found that counseling with Gould was

"helpful" and believed that medication "ha[d] been helping her with this symptom."

(AR 647.)  Rye did in fact see Gould for treatment of her depression from approximately

December 2012 through July 2013 (AR 640; *see* AR 609, 611, 641, 653–55, 661–65),),

but Gould herself opined in a July 2013 letter that Rye's depression was "mild" and that

her "mental health problems do not significantly interfere with her ability to perform the

activities of daily living" (AR 641).  The record supports this opinion, reflecting

relatively stable moods and a normal, bright affect.  (*See, e.g.*, AR 523, 526, 546, 576,

579, 581, 585, 650, 791, 794, 799, 884, 886, 889, 891, 893–94.)  Until recently, Rye

herself has attributed most of her limitations in functioning to her physical impairments, not her mental ones.

### B.    Dr. Huyck

The ALJ also gave limited weight to the opinions of treating physician Dr. Karen Huyck (AR 36, 38), who opined in October 2012 that, due to her pain levels and other physical impairments, Rye would likely be limited in her ability to sustain even sedentary work (AR 618).  The ALJ explained that, like Dr. Greywolf's opinions, Dr. Huyck's opinions are not supported by or consistent with the evidence of record.  (AR 36–38.) The ALJ stated: "While I am cognizant of Dr. Huyck's status as a treating provider, her opinion[s] [are] not supported by or consistent with the evidence of record.  Clinical examinations, treatment notes, and daily activities show that [Rye] is able to perform a range of work at the light exertional level."  (AR 36.)  Substantial evidence, cited by the ALJ in his decision, supports this finding.

For example, and as noted by the ALJ, Dr. Huyck's own treatment notes from August 2012 indicate that Rye had a normal tandem, heel, and toe gait; and full strength in the lower extremities.  (AR 37, 611.)  And imaging of Rye's lumbar spine showed no significant abnormalities.  (AR 35–36, 525, 802.)  December 2008 treatment notes from Dr. Christine Hand document normal gait, sensation, motor function, and coordination. (AR 36, 448; *see also* AR 799, 804–05, 884, 886, 890–91.)  Treatment records from June 2010 and April 2012, respectively, indicate that Rye was able to walk regularly for exercise.  (AR 36, 539, 581 ("able to walk a mile [without] leg pain [or] power or sensory loss"); *see also* AR 319 (Rye reporting that she could walk "two miles").)  Treatment

notes from September 2010 state that Rye's chronic lower back pain was "controlled with opioids and [physical therapy]."  (AR 545; *see* AR 36.)  Treatment notes from June 2011 reflect a normal gait, coordination, and reflexes; normal motor function and strength. (AR 36, 565.)  Other medical notes indicate that Rye responded well to medication and other treatment, and had an increased ability to perform activities without breaks. (AR 37, 584 ("with the pain medication she has had improvement in her ability to do household tasks with less rest"), 586 ("has had an improvement in her functioning due to her back pain," "able to do dishes and also sweep and do other housekeeping tasks"), 649 ("has had further improvement with her back pain with the increased dose of methadone," "is able to perform an extra 30 minutes of activity before needing to rest"), 652, 654 ("significant improvement in her insomnia since Remeron was started"), 656, 659, 837 ("[m]aking good progress with strengthening of lower abs/core region"), 868 ("[f]elt good" after first acupuncture session).)

Despite Rye's argument to the contrary (*see* Doc. 10-1 at 19), gait, sensation, motor function, and coordination, are all relevant to a claimant's ability to sit, stand, and walk.  Moreover, an ability to walk is relevant to a claimant's physical functional capacity.  Thus, it was proper for the ALJ to consider this evidence in determining how much weight to afford to Dr. Huyck's opinions regarding Rye's physical limitations.  It was also proper for the ALJ to consider that Rye's back pain lessened with medication and other therapies.  Rye asserts that the ALJ should not have relied on this evidence because the medication and other therapies did not "address all of her back pain" and did not "completely solve the problem."  (*Id.*)  But complete resolution of all pain or

impairments is not required to support a finding of a claimant's ability to work.  *See Prince v. Astrue*, 490 F. App'x 399, 400 (2d Cir. 2013) ("'[D]isability requires more than mere inability to work without pain.  To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment.'") (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983)).

### C.     Occupational Therapist Morneau

Next, Rye asserts that the ALJ erred in his analysis of the opinions of occupational therapist Gregory Morneau, who performed an evaluation of Rye's musculoskeletal system in August 2012.  (AR 614–17.)  Morneau's evaluation indicates that Rye had a "sitting tolerance" of 25 minutes, a dynamic standing tolerance of 33 minutes, and a maximum grip force of 55 pounds on the right and 64 pounds on the left; that Rye's fine motor coordination was at a low but functional level; that Rye walked approximately 0.3 miles in six minutes, which was 62% of the expectation; that Rye walked 56 steps without using a rail; that Rye had an occasional lifting tolerance of 23 pounds from floor to knuckle and knuckle to shoulder (maximum 33 pounds) and 18 pounds overhead (maximum 23 pounds); that Rye had an occasional carrying tolerance of 23 pounds (maximum 33 pounds) for a distance of 30 feet; and that Rye had functional range of motion.  (AR 614–15.)  Morneau stated that the overall test findings, in combination with clinical observations, "suggest the presence of near full levels of physical effort" by Rye. (AR 615.)  Dr. Huyck, who had referred Rye to Morneau (AR 614), interpreted the evaluation as follows:

Rye showed deficits of lifting, positional tolerance, and ambulation. . . . Fine motor coordination was at a low but functional level. Of note, lifting amounts are for occasional lifting. Frequent lifting capacity is expected to be lower than the occasional weight level listed in the report. Also, given her high pain levels and decreased function for several days after just one hour of testing, it is my opinion that she would not be able to tolerate this level of activity over the course of an eight[-]hour day, five days per week. Positional tolerances will also[ ]likely limit her ability to sustain sedentary work.

(AR 618.)

The ALJ accurately stated that Morneau's evaluation "is generally consistent with performance of a range of work at the light exertional level." (AR 35.) Specifically, the ability to occasionally lift 23 pounds from floor to shoulder and 18 pounds overhead, and the ability to occasionally carry 23 pounds for a distance of 30 feet, are consistent with a "light work" restriction, which the ALJ included in his RFC determination. (AR 34; *see* 20 C.F.R. §§ 404.1567(b), 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.").) Although the ALJ deviated from Morneau's evaluation in finding that Rye could "sit, stand, and walk for one hour each at a time followed by a change of position or the ability to stretch" (AR 34), substantial evidence supports this finding, as discussed above regarding Dr. Huyck's opinions. Thus, the Court finds no error in the ALJ's analysis of Morneau's opinions. It is also noteworthy that, as an occupational therapist, Morneau was not an "acceptable medical source" under the regulations and therefore his opinions do not demand the same level of deference as those of a treating physician or psychologist. *See* 20 C.F.R. § 404.1513(d)(1); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

27

### D.      Dr. Abramson

Finding that the opinions of Dr. Greywolf, Dr. Huyck, and Morneau were not entitled to significant weight, the ALJ gave "great weight" to the opinions of nonexamining agency consultant Dr. Leslie Abramson.  In May 2012, Dr. Abramson completed a physical RFC assessment form regarding Rye, concluding that she could occasionally lift and/or carry and push and/or pull 20 pounds; frequently lift and/or carry and push and/or pull 10 pounds; stand and/or walk for about six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday.  (AR 170–71.) Dr. Abramson further concluded that Rye could never climb ladders, ropes, or scaffolds; but could engage in unlimited climbing of ramps/stairs and unlimited balancing, stooping, kneeling, crouching, and crawling.  (AR 171.)  Dr. Abramson found that Rye must avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation; must avoid even moderate exposure to hazards such as machinery and heights; and could have unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, and vibration.  (AR 172.)

The regulations permit the opinions of nonexamining agency consultants to override those of treating physicians, when the former are more consistent with the evidence than the latter.  *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 563, 567–68 (2d Cir. 1993)) ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record."); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . . consultants

. . . may be entitled to greater weight than the opinions of treating or examining sources."). Here, the opinions of Dr. Abramson are more consistent with the record than those of the treating sources and examining consultants. The ALJ explained his decision to give great weight to Dr. Abramson's opinions as follows: "I find the opinion of state agency consultant Dr. Abramson to be consistent with and supported by the evidence of record. . . . In support of her opinion, [Dr. Abramson] cited to [Rye's] allegations of limitation, description of activities, medication regimen, and clinical examination." (AR 38.) Substantial evidence supports this explanation, as discussed above.

Rye claims the ALJ should have given less weight to Dr. Abramson's opinions because the Doctor's RFC assessment was based on an incomplete record which did not include the mental health evaluations of Gould and Dr. Greywolf. (*See* Doc. 10-1 at 22.) The ALJ recognized this deficiency, however, and properly found that: (1) "[a]lthough [Dr. Abramson] did not evaluate all the opinions in the record, as the other opinion statements are not fully supported by the evidence of record, her opinion remains persuasive"; and (2) "[the a]dditional treatment notes [which] were admitted to the record after Dr. Abramson reviewed the record . . . do not document deterioration or significant change in [Rye's] condition." (AR 38.) Generally, where it is unclear whether the consulting agency physician reviewed all of the claimant's relevant medical information before making her opinions, these opinions will not override those of the treating physicians. *See Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (agency physician did not review evidence documenting an additional diagnosis and recommendation for surgery). In cases like this, however, where the agency consultant opinions are supported

by the record and there is no evidence of a new diagnosis or a worsening of the claimant's condition after the consultant opinions were made, the ALJ may rely on them. *See Charbonneau v. Astrue*, Civil Action No. 2:11–CV–9, 2012 WL 287561, at *7 (D. Vt. Jan. 31, 2012).  The Court does not find that the treatment notes and opinions of Gould and Dr. Greywolf which were admitted to the record after Dr. Abramson completed her RFC Assessment form, document a deterioration or significant change in Rye's condition.  Neither does the Court find that these treatment notes and opinions would have affected Dr. Abramson's opinions about Rye's physical RFC, especially given that Gould and Dr. Greywolf treated and made opinions about Rye's mental impairments, not her physical ones.

Thus, the Court finds no error in the ALJ's allocation of great weight to the opinions of Dr. Abramson.  Moreover, Rye neglects to acknowledge that the ALJ's RFC determination is more restrictive than Dr. Abramson's findings in some ways.  For example, the RFC determination includes the limitation that Rye can sit, stand, and walk for only one hour at a time, rather than for about six hours in an eight-hour workday, as Dr. Abramson opined.  (*Compare* AR 34 *with* AR 171.)

## IV.    Assessment of Rye's Credibility

Rye claims that the ALJ also erred in his assessment of her credibility, asserting that the ALJ's conclusions "seem to rely on significant medical assumptions . . . and tend to avoid the ALJ's responsibility to develop the record."  (Doc. 10-1 at 25.)  Rye further claims that "many of the [ALJ's] credibility determinations are unfounded, against the weight of the evidence, or contrary to judicial precedent."  (*Id.* at 26.)  The Court finds

that the ALJ acted within his discretion in assessing Rye's credibility, and that the ALJ's assessment that Rye's statements concerning the intensity, persistence, and limiting effects of her symptoms "are not entirely credible" (AR 35), is supported by substantial evidence.

It is the function of the Commissioner, not the court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). If the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996). An important indicator of the credibility of a claimant's statements is their consistency with other information in the record, including the claimant's medical treatment history. *Id.* at *5, *7.

Here, the ALJ stated that "[t]reatment notes, daily activities, and observations of [Rye] show that she is not as limited as she allege[s]." (AR 35.) The ALJ specifically relied on medical records which indicated that Rye did not appear in distress or in pain and did not document any difficulty remaining seated or walking at medical appointments. (AR 37.) The ALJ stated:

> [Rye] complained of pain as a 7 or 8 on the 1-10 pain scale. It stands to reason that pain this significant would manifest itself in [Rye's] behavior at office visits, but treatment notes do not describe [her] as appearing in

31

> distress, as in pain, or as exhibiting pain behaviors.  She was not described
> as unable to remain seated for the office visit, as unable to climb on or off
> the examination table, or as unable to ambulate throughout the office.

(*Id.* (citation omitted).)  The ALJ noted a February 2012 treatment note from Nurse

Megan O'Brien, which questioned Rye's credibility, stating: "[Rye] becomes more

uncomfortable appearing when I enter the exam room.  She begins rocking in her chair.

She goes from sitting to standing without splinting her back or significant delay in

movement."  (AR 593; *see* AR 37.)  The ALJ stated several other specific reasons–which

are supported by the record–to explain why he questioned Rye's credibility, including:

(1) "[Rye's] reports regarding her headache frequency have not been consistent, which

lessens her credibility" (AR 37; *see* AR 78–80, 447, 476, 535, 539, 690, 692, 792, 796,

798, 889, 893); (2) although Rye complained of breathing problems, "[she] noted it was

not interfering with her ability to go on short walks," and she "continued to smoke"

despite her treating physician's encouragement for her to stop (AR 38; *see* AR 319, 581,

757, 760–62, 769); (3) "[t]he strength of [Rye's] credibility has been affected not only by

the discrepancies between her allegations and her presentation upon clinical examination,

but also by her continued substance abuse[;] [o]f note, when a urine drug screen returned

positive for marijuana use in September 2009, [she] denied any overt exposure or use of

illicit substances" (AR 38; *see* AR 435, 486–87, 653–54, 657); and (4) "[t]hat [Rye] has

continued to use illicit substances, against the advice of her treating providers, impacts

her credibility and the strength of her alleged limitations" (*id.*).  These are all proper

factors for an ALJ to consider in assessing a claimant's credibility.  Clearly, in making

this assessment, it is relevant to consider the consistency of a claimant's statements

regarding the intensity and frequency of her symptoms, *see* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."), as well as the claimant's lack of compliance with treatment recommendations and drug-seeking behavior, *see* 20 C.F.R. § 404.1530(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled."); *Anderson v. Shalala*, 51 F.3d 777, 780 (8th Cir. 1995) (claimant's "drug-seeking behavior further discredits her allegations of disabling pain").

Moreover, as discussed above, substantial evidence supports the ALJ's assessment that the medical records do not indicate that Rye was as significantly limited as she alleges.  (*See, e.g.*, AR 448 ("[n]ot in acute distress"), 478 ("no apparent distress"), 492 (same), 508 (same), 513 (same), 540 ("appears healthy and in no distress"), 544 ("no evidence of pain on exam"), 564 (other than headaches once every one to two weeks, "[a]ll other systems reviewed and are negative"), 585 ("no apparent distress," "has a full range of emotion," "does not have a flat affect"), 590 ("in mild distress," "able to walk about the examination room, but is shifting in her chair . . . due to discomfort"), 648 ("no apparent distress," "does not have a flat affect," "not tearful"), 652 ("continues to feel that she has had some benefit with the use of [methadone] in her ability to be more functional during the course of the day"), 656 ("continues to be able to work longer without a break," "wonders . . . whether she is 'doing too much' and this causes a flare of her pain"), 664 ("no longer has pain in her low back or hip"), 665 (in "mild distress" due to knee injury), 791 (pain rated as 5/10, "[h]as been going to PT once per week with good

33

response," no anxiety or depression), 794 (pain rated as 0/10 but averaging 5/10),

799 ("[a]ble to function and perform ADLs with adequate analgesia on present

medications with no side effects or adverse reactions"), 886 (same), 889 (pain rated as

5/10, "[f]eeling better on present medication regimen combined with

acupuncture/chiropractic treatments").)  Although the record indicates that Rye

occasionally had limited range of motion, spikes in pain levels, and increased depression

or anxiety, overall, her appearance and presentation during clinical visits do not

substantiate her claims of severe limitation in functionality.

Furthermore, the ALJ's assessment that Rye was able to "engage[] in a range of

activities consistent with the [RFC stated in the ALJ's decision]" (AR 37), is supported

by the record.  Specifically, the record demonstrates that, during the alleged disability

period, Rye's daily activities included dressing herself, making coffee, and doing

housework such as making her bed, washing dishes, laundering clothes, and sweeping,

with limitations due to physical pain.  (AR 32, 315–16, 339–40, 586.)  Rye was also able

to walk, ride in a car, go out alone, manage her finances, watch television and movies,

read, do puzzles, attend appointments, and go shopping in stores.  (AR 33, 317–18,

341–42.)  Although these daily activities can not be described as vigorous or complex,

they provide useful insight to the ALJ in determining whether Rye could work, and it was

proper for the ALJ to consider them in assessing Rye's credibility.  *See* 20 C.F.R. §§

404.1529(c)(3)(i), 416.929(c)(3)(i) (providing that a claimant's "daily activities" are a

factor to be considered in evaluating the intensity and persistence of her impairments);

SSR 96-7p, 1996 WL 374186, at *3, 5.  Rye argues that "the fact that [she] performs

daily activities such as getting dressed, making coffee, etc., with noted pain, should not be held against her." (Doc. 10-1 at 11.) But the ALJ was not obligated to accept Rye's allegations of pain and characterization of the record without question; he was entitled to exercise discretion in assessing Rye's credibility in light of the record as a whole. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam).

Rye again argues that the ALJ should have considered "longitudinal evidence" which consistently described "location, duration, frequency, and intensity of pain" since she was 13 years old. (Doc. 10-1 at 24.) But Rye's description of her pain before the alleged disability onset date is not persuasive proof that she was disabled during the alleged disability period, especially considering that Rye was able to work full time for periods since she was 13 years old (*see* AR 292, 303–05, 308–09). Moreover, as discussed earlier, the ALJ is not required to discuss every piece of evidence at every step of his analysis. *See Petrie*, 412 F. App'x at 407 (quoting *Mongeur*, 722 F.2d at 1040).

Given that the ALJ's credibility assessment is supported by substantial evidence, and the credibility findings of an ALJ are "entitled to great deference and therefore can be reversed only if they are patently unreasonable[,]" the Court does not disturb the ALJ's credibility assessment of Rye. *Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted).

## V.   Step-Five Finding that Jobs Exist in Significant Numbers in the National Economy that Rye Can Perform

Rye next argues that substantial evidence does not support the ALJ's step-five finding that jobs exist in significant numbers in the national economy that Rye can

perform.  (*See* Doc. 10-1 at 28–31.)  In light of the above discussion, the claim is

unavailing, as it depends on the success of the aforementioned arguments, all of which

the Court rejects.[3]  Specifically, Rye's step-five claims rely on the assertions that the

ALJ's hypotheticals to the VE "were not indicative of Ms. Rye's actual limitations," and

that, when hypotheticals were posed to the VE which included Rye's "actual limitations,"

the VE determined that no jobs would exist.  (*Id.* at 31.)  The ALJ is not bound to accept

as true the restrictions presented in hypothetical questions propounded by a claimant's

counsel.  And testimony from a VE "is only useful if it addresses whether the particular

claimant, with his limitations and capabilities, can realistically perform a particular job."

*Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).  Here, the hypothetical questions

posed by the ALJ and reflected in the ALJ's RFC determination are supported by

substantial evidence.  Thus, it was proper for the ALJ to rely on the VE's testimony in

response to these questions, stating that jobs existed in significant numbers in the national

economy that Rye can perform.

## VI.    Decision Not to Reopen Rye's June 2008 Applications

Rye alleges another flaw in the ALJ's decision: it does not address Rye's request

to reopen her June 2008 applications for benefits.  The Court finds no error.  One day

before the November 2013 administrative hearing, Rye's attorney requested in a letter to

---

[3]  The Court also rejects Rye's suggestion that the ALJ should have used the older age category in applying the Grids as a framework in finding Rye not disabled.  (Doc. 10-1 at 27.)  On the date of the ALJ's decision, Rye was 47 years old, and thus fell soundly in the category of a "younger" individual between the ages of 18 and 49.  *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 201.00(h)(1) ("The term younger individual is used to denote an individual age 18 through 49.").

the ALJ that the ALJ "establish a disability onset date of September 4, 2010, three years

prior to the date Ms. Rye first met with [Dr.] Greywolf."  (AR 398.)  The ALJ's

November 2013 decision implicitly granted this request, going back even further and

considering whether Rye was disabled "from August 1, 2006."  (AR 41.)  Rye states that

her June 2008 applications allege a disability onset date of October 31, 2005, and appears

to fault the ALJ for failing to discuss in his decision why he did not consider the nine-

month period between the start of November 2005 and the end of July 2006.  (*See* Doc.

21 at 13, 15.)  But Rye fails to demonstrate that there is any evidence from the period

between November 2005 and July 2006 that would have changed the ALJ's decision.

Moreover, as noted above, Rye sought a reopening of her prior applications only in the

alternative.  Her preferred method, in her attorney's own written words, was for the ALJ

to use September 4, 2010 as the disability onset date.  Rye's attorney's letter to the ALJ

states: "*If onset cannot be assessed by September 30, 2010*, [her] date last insured,

Ms. Rye requests that this tribunal reopen her prior applications of June 19, 2008."

(AR 399 (emphasis added).)  The ALJ did not find that an onset date could not be

assessed by September 30, 2010, but rather, considered whether Rye was disabled

starting in August 2006.  For these reasons, the ALJ did not err in failing to explicitly

address Rye's request to reopen her June 2008 applications.

## VII.   Appeals Council's Decision Not to Consider Additional Evidence

Finally, Rye argues that the Appeals Council erred in failing to consider

"additional evidence" which Rye's attorney submitted after the ALJ's decision.  The

additional evidence consists of Dr. Greywolf's November 2013 report and May 2014

letter, discussed above.  (AR 13–16, 19–25.)  The Court finds that the Appeals Council

properly declined to consider this evidence.  (AR 7.)

Pursuant to 42 U.S.C. § 405(g), "[t]he court may . . . at any time order additional

evidence to be taken before the Commissioner . . . , but only upon a showing that there is

new evidence which is material and that there is good cause for the failure to incorporate

such evidence into the record in a prior proceeding . . . ."  In applying this regulation, the

Second Circuit has developed a three-part test, allowing supplementation of the record

where evidence is:

> (1) "new" and not merely cumulative of what is already in the record . . .[;]
> (2) material, that is, both relevant to the claimant's condition during the
> time period for which benefits were denied and probative . . .[; and (3)
> where there is] good cause for [the claimant's] failure to present the
> evidence earlier.

*Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991)

(citations and internal quotation marks omitted); *see* 20 C.F.R. § 405.401(c).

The evidence at issue here does not meet the "materiality" requirement.  The

Second Circuit has explained that "[t]he concept of materiality requires . . . a reasonable

possibility that the new evidence would have influenced the [Commissioner] to decide

[the] claimant's application differently."  *Lisa*, 940 F.2d at 43; *see Eusepi v. Colvin*,

No. 13-4037-CV, 2014 WL 6725658, at *2 (2d Cir. Dec. 1, 2014).  Rye fails to establish

that the additional evidence would have influenced the Commissioner to decide her

application differently.  Dr. Greywolf's November 2013 report discusses September and

October 2013 testing which Dr. Greywolf had already summarized and discussed in an

October 2013 letter to Rye's attorney; and the ALJ explicitly considered that letter in his

decision, demonstrating that he was aware of both the testing and Dr. Greywolf's interpretation of it.  (*See* AR 21–25, 39, 604–06.)  Moreover, the ALJ had Rye's complete medical record when he made his decision, and gave limited weight to Dr. Greywolf's opinions for the proper reasons discussed above.  The additional evidence does not provide new medical or other objective evidence to support those opinions.

The November 2013 report and May 2014 letter do not describe Rye's activities of daily living and do not demonstrate extreme difficulties in social functioning and attention, persistence, or pace.  (*See* AR 15–16, 21–25.)  In fact, the report indicates that Rye was able to live with a friend, have a close relationship with her daughter and grandchildren, be cooperative and attentive during testing, and engage easily. (AR 21–22.)  The additional evidence also does not connect Dr. Greywolf's opinions to the alleged disability period, between 2006 and 2010, as discussed above.  Many of the records discussed by Dr. Greywolf predate Rye's alleged disability onset date by years, going back to when Rye was only 13 or 14 years old, decades before the alleged disability onset date of August 1, 2006.  (*See, e.g.*, AR 15.)  "'An implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition.'"  *Tirado v. Bowen*, 705 F. Supp. 179, 182 (S.D.N.Y. 1989) (quoting *Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984) (per curiam)); *see Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004).  Thus, Rye has failed to demonstrate that the Appeals Council erred in

failing to consider the additional evidence that Rye's attorney submitted after the ALJ's decision.

### **Conclusion**

For these reasons, the Court DENIES Rye's motion (Doc. 10), GRANTS the Commissioner's motion (Doc. 17), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 17th day of February, 2016.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge